UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:21-CV-00144-GNS-HBB

EDWARD BARDIN                                                          PLAINTIFF

v.

NISSAN MOTOR COMPANY, LTD. et al.                                     DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motions to Exclude (DNs 64, 65), Defendants'

Motions to Exclude (DNs 69, 70), Defendants' Motion for Summary Judgment (DN 67), and

Defendants' Motions for Leave to Exceed Page Limits (DNs 66, 68).  Fully briefed, the motions

are ripe for adjudication.

## I.    STATEMENT OF FACTS

Plaintiff Edward Bardin ("Bardin") was driving a Nissan vehicle in January 2018, when it

suddenly caught fire allegedly due to defective wires and wiring harnesses.  (Compl. ¶¶ 18, 20-23,

DN 1-1).  Bardin initiated this products liability action in Adair Circuit Court, Kentucky, in January

2019, naming as Defendants Nissan Motor Company, Ltd.; Nissan North America, Inc.; Nissan

Motor Manufacturing Corporation, U.S.A.;[1] Franklin Nissan, Ltd. Co.;[2] and "Unknown

Defendant(s)" (collectively "Nissan") and asserting claims of strict liability, negligence, and

breach of warranty.  (Compl. ¶¶ 3-17, 27-121).  The action was removed to this Court in October

2021.  (Notice Removal, DN 1).  Nissan has moved for summary judgment, and the parties have

---

[1] In 2000, Nissan Motor Manufacturing Corporation, U.S.A. merged with Nissan North America, Inc., retaining the name Nissan North America, Inc.  (Notice Removal 1 n.1, DN 1).
[2] Franklin Nissan Ltd. Co. has since been dismissed from the action.  (Agreed Order, DN 1-4).

moved to exclude each other's experts.  (Defs.' Mot. Summ. J., DN 67; Pl.'s Mot. Exclude Defs.'

Expert, DN 64 [hereinafter Pl.'s Mot. Exclude Loud]); Pl.'s Mot. Exclude Defs.' Expert, DN 65

[hereinafter Pl.'s Mot. Exclude Olson]; Defs.' Mot. Exclude Pl.'s Expert, DN 69 [hereinafter

Defs.' Mot. Exclude Karasinski]; Defs.' Mot. Exclude Pl.'s Expert, DN 70 [hereinafter Defs.' Mot.

Exclude Morris]).[3]

## II.   JURISDICTION

The Court has subject-matter jurisdiction over this action through diversity jurisdiction.

*See* 28 U.S.C. § 1332.

## III.   DISCUSSION

### A.   *Daubert* Motions

Fed. R. Evid. 702 governs expert witness testimony and provides that an expert's opinion

is admissible if:

(a)   the expert's scientific, technical, or other specialized knowledge will help
     the trier of fact to understand the evidence or to determine a fact in issue;
(b)   the testimony is based on sufficient facts or data;
(c)   the testimony is the product of reliable principles and methods; and
(d)   the expert has reliably applied the principles and methods to the facts of the
     case.

The trial court must act as a gatekeeper to ensure that expert testimony is both relevant and reliable,

as required by Fed. R. Evid. 104 and 702.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579,

589 (1993); *Conwood Co. v. U.S. Tobacco Co., L.P.*, 290 F.3d 768, 792 (6th. Cir. 2002) (citation

omitted).  "It is the proponent of the testimony that must establish its admissibility by a

preponderance of proof," and "[a]ny doubts regarding the admissibility . . . should be resolved in

favor of admissibility."  *In re E. I . Du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp.

---

[3] Because Bardin does not contest Nissan's motions for leave to exceed page limits and the requests
appear reasonable, those motions are granted.

3d 728 (S.D. Ohio 2015) (citing Fed. R. Evid. 702 advisory committee note to 2000 amendments). "[R]ejection of expert testimony is the exception, rather than the rule," as "[t]he Court's gatekeeping role does not supplant the traditional adversarial system and the jury's role in weighing evidence." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted); *Certain Underwriters at Lloyd's v. Morrow*, No. 1:16-CV-00180-GNS-HBB, 2019 WL 3558177, at *8 (W.D. Ky. Aug. 5, 2019) (citing *Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 691 (E.D. Mich. 2004); *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (citation omitted). "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (internal citation omitted) (citations omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* (internal quotation marks omitted) (internal citation omitted). Still, the "liberal interpretation of this requirement 'does not mean that a witness is an expert simply because he claims to be.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted).

When determining the reliability of an expert's testimony, a key is "whether the reasoning or methodology underlying the testimony is sufficiently valid . . . ." *Daubert*, 509 U.S. at 592-93.

The Supreme Court has advised, however, that the inquiry is flexible and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95.   Though there is no definitive checklist for determining whether an expert's testimony is reliable, *Daubert* outlines a non-exhaustive list of factors for courts to consider:  (1) whether the theory or method in question "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community . . . ." *Id.* at 593-94 (citation omitted).

Where a party challenges the testimony of a proffered expert for insufficient factual basis, data, principles, methods, or their application, "the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (quoting *Daubert*, 509 U.S. at 592).   *Daubert* involves balancing the desire to admit relevant evidence liberally against the necessity of excluding misrepresentative "junk science."  *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citation omitted).   Ultimately, "the trial judge . . . ha[s] considerable leeway in deciding . . . whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152; *Conwood Co.*, 290 F.3d at 792; *see Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty.   And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citation omitted) (citation omitted)).

"The subject of an expert's testimony must be 'scientific . . . knowledge.'"  *Daubert*, 509 U.S. at 589-90.   The gatekeeping obligations in *Daubert* only applied to "scientific knowledge,"

but were later extended to include "testimony based on 'technical' and 'other specialized' knowledge." *Id.* at 592; *Kumho Tire Co.*, 526 U.S. at 141, 152 (citation omitted). "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably there are no certainties in science." *Id.*; *see Wellman v. Norfolk & W. Ry. Co.*, 98 F. Supp. 2d 919, 923 (S.D. Ohio 2000) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." (citation omitted)); *cf. Nemir v. Mitsubishi Motor Sales of Am., Inc.*, 6 F. App'x 266, 275 (6th Cir. 2001) ("In evaluating an expert witness, '*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts on the case at hand . . . not that they know all the answers to all the questions a case presents . . . .'" (citation omitted)). As the Supreme Court has noted:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and opinion offered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

The Sixth Circuit has noted "[r]ed flags that caution against certifying an expert," such as "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citation omitted); *cf. Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("We have held that a district court is required to rule out 'subjective belief or unsupported speculation' by considering 'whether the testimony has been subjected to the scientific method." (citation omitted)); *Scientific Method*, Black's Law Dictionary (11th ed. 2019) ("The process of generating hypotheses and testing them through experimentation, publication, and replication.").

Ultimately, it is the movant's burden to establish that its proffered experts' theories are "reliable and adequately supported by sound technical data, methodology and testing." *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000) (citation omitted).

### 1.   *Nissan's Experts*

Bardin contends that John Loud ("Loud") and John Olson ("Olson") should be precluded from testifying as expert witnesses on behalf of Nissan on the grounds that they are unqualified, and their testimony is unreliable.  (Pl.'s Mot. Exclude Loud 7-13; Pl.'s Mot. Exclude Olson 7-13). Due to the similarity of Bardin's objections to each of Nissan's experts, both motions may be addressed together.

Both Loud and Olson opine that the only cause of the fire that cannot be eliminated is the ignition of a flammable fluid or accelerant on Bardin's pant leg.  (Defs.' Mot. Summ. J. Ex. 12, at 7, DN 67-12 [hereinafter Loud Report]; Defs.' Mot. Summ. J. Ex. 11, at 18, DN 67-11 [hereinafter Olson Report]).  Loud and Olson base their opinions on the following information:  (1) Bardin knew what overheated wiring smells like; (2) Bardin first noticed the fire on his pant leg; (3) a can of WD-40 (a flammable accelerant) was found in the back floor of the truck; (4) there was no evidence to suggest that the vehicle initiated the fire; and (5) Bardin described that the fire occurred rapidly.  (Loud Report 6-7; Olson Report 16-18).

Loud received a master's degree in electrical engineering and is licensed as a professional engineer in numerous states and is also a Certified Vehicle Fire Investigator.  (Loud Report 46). He has worked as a consultant for over twenty-five years, with a focus on investigating where "there's a failure that caused a fire and an injury . . . ."  (Loud Report 45; Loud Dep. 41:2-3, 41:24-25, Jan. 3, 2023, DN 67-5).  He has investigated fires that started under circumstances similar to the present case, where static electricity acted as an ignition source.  (Loud Dep. 44:21-45:8).

Olson received a bachelor's degree in mechanical engineering, is licensed as a professional engineer, and is also a Certified Vehicle Fire Investigator.  (Olson Report 21).  He has worked as a consultant for over ten years, and has offered opinions regarding vehicle fire causation.  (Olson Report 10; Olson Dep. 71:6-72:17, Dec. 29, 2022, DN 67-6).  Based on their experience, both Loud and Olson are qualified to testify as to the origin of the fire in this case.

Bardin argues that Loud and Olson are unqualified to present testimony regarding the cause of the fire because they are not experts in human factors or sensory perception.  (Pl.'s Mot. Exclude Loud 7; Pl.'s Mot. Exclude Olson 8).  Bardin claims that Loud and Olson cannot offer opinions as to what Bardin would have noticed without being an expert in human factors or sensory perception.  (Pl.'s Mot. Exclude Loud 7; Pl.'s Mot. Exclude Olson 8).  In response, Nissan notes that it is immaterial whether Loud is qualified to testify about human factors because his opinion is based upon a demonstrative test that he conducted in conjunction with Bardin's testimony.  (Defs.' Resp. Pl.'s Mot. Exclude Loud 6-7, DN 75; Defs.' Resp. Pl.'s Mot. Exclude Olson 6, DN 74; *see* Loud Report 22-30; Loud Dep. 151:6-17).  Nissan also notes that Loud "is qualified to testify relating to human sensory perception as it relates to his fields of expertise—electrical engineering and fire investigation."  (Defs.' Resp. Pl.'s Mot. Exclude Loud 6 n.3).

Loud and Olson do not have to be human behavior experts to testify about the physical effects of a fire like the one Bardin's experts describe.  Fed. R. Evid. 703 dictates that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Loud and Olson both observed the results of a defect-caused fire through their demonstration test, which is sufficient to inform their opinions.

Loud offers an opinion on human perception only as it relates to electrical engineering, for which Bardin does not dispute his expertise.  (Pl.'s Mot. Exclude Loud 7).  Loud has proffered

7

testimony describing human sensory perception related to an electrical failure and the associated physiological response.   (Loud Dep. 106:4-9).   Loud explained, "Inasmuch as humans are interacting with intolerable acrid smoke I do have opinions on that, having worked in that and experienced that many, many times. . . . I'm a human with senses and have experience related to this subject matter."   (Loud Dep. 103:11-14, 103:25-104:1).   Loud's experience with human perception of electrical fires in addition to his observation of the demonstration test conducted for this case qualifies him to offer an opinion as to what Bardin would have noticed and how that informs the possible causes of the fire in this matter.   Likewise, Olson's human perception testimony is related to his experience as an automotive engineer and fire investigator, and Bardin does not dispute Olson's expertise in these fields.   (Pl.'s Mot. Exclude Olson 7-8).   It is within the realm of Olson's expertise as a fire investigator to opine that a certain kind of fire may produce a noticeable smell.   The fact that Loud and Olson are not bona fide "human perception" experts is one that goes to their credibility and is ripe for probing on cross-examination.   *See Daubert*, 509 U.S. at 596.

Bardin next argues that Loud's and Olson's opinions are unreliable because they lack sufficient basis in facts or data, and employed unreliable principles and methods in reaching their opinions and are simply *ipse dixit*.   (Pl.'s Mot. Exclude Loud 5).   Bardin first contends that these opinions are based on insufficient facts and data because there is no surviving evidence demonstrating that an accelerant fire occurred, nor what the ignition source was.   (Pl.'s Mot. Exclude Loud 8; Pl.'s Mot. Exclude Olson 8-9; Loud Report 6).   Furthermore, he states that Loud's and Olson's opinions lack a sufficient basis because "all the available evidence shows that no exposed accelerant was present in the vehicle or on [Bardin] []."   (Pl.'s Mot. Exclude Loud 8; Pl.'s Mot. Exclude Olson 8 ("This includes testing that shows no accelerants were present on the

vehicle's carpet and Plaintiff's testimony in which he maintains his pants were clean.")).  Bardin takes issue with Nissan's experts' reliance on his testimony in forming their opinions.  (Pl.'s Mot. Exclude Loud 3; Pl.'s Mot. Exclude Olson 8).  Nissan contends that such reliance is necessary for a well-researched opinion, as Bardin is the only witness to the fire.  (Defs.' Resp. Pl.'s Mot. Exclude Loud 11; *see* Defs.' Resp. Pl.'s Mot. Exclude Olson 10-11).

Loud's and Olson's opinions are based on sufficient facts and data.  One basis for their opinions is Bardin's testimony regarding how quickly the fire started and that he did not notice it before his leg was burning.  (Loud Report 31-34; *see* Olson Report 17-18).  Loud and Olson additionally relied on reports from Bardin's experts, photographs and review by a former Nissan engineer, along with numerous other materials.  (Loud Report 39; Olson Report 3-6; Loud Dep. 111:20-112:8; *see* Defs.' Resp. Pl.'s Mot. Exclude Loud 13 n.9).  They did not have the opportunity to trace electrical circuits because the dashboard had been altered, nor were they able to test Bardin's pants for possible accelerants because they were disposed of prior to his request to keep them.  (Loud Dep. 65:14-66:12, 114:4-10).  Considering these experts relied on numerous materials in forming their opinions, the factors they failed to test or consider go to the weight of their testimony.  *Potts v. Martin & Bayley, Inc.*, No. 4:08-CV-15, 2011 WL 4703058, at *4 (W.D. Ky. Oct. 4, 2011) ("Catlow's complaint regarding these allegedly unaccounted for factors goes to the weight of the testimony, not its admissibility."); *see Ball Corp. v. Air Tech of Mich., Inc.*, No. 4:16-CV-42-TLS, 2022 WL 1801120, at *6 (N.D. Ind. June 2, 2022) ("[T]he purported lack of 'physical evidence' is not problematic given this case involved a fire, where evidence is often destroyed."  (citations omitted)).  Bardin may question Loud and Olson on cross-examination regarding data they did not collect, but the alleged shortcomings do not negate the information that they *did* rely on.

Bardin next contends that Loud's and Olson's opinions are not based on reliable principles and methods because they are based heavily on Bardin's testimony and not peer reviewed or tested (nor capable of being tested), and had no error rate.  (Pl.'s Mot. Exclude Loud 9; Pl.'s Mot. Exclude Olson 9-10).[4]  Loud and Olson utilized NFPA 921, which is the primary accepted methodology for fire investigators.  (Loud Report 35-36; Olson Report 12-13).  "NFPA 'is designed to assist individuals who are charged with the responsibility of investigating and analyzing fire and explosion incidents and rendering opinions as to the origin, cause, responsibility, or prevention of such incidents.'"  *Travelers Cas. Ins. Co. of Am. ex rel. Palumbo v. Volunteers of Am. Ky., Inc.*, No. 5:10-301-KKC, 2012 WL 3610250, at *2 (E.D. Ky. Aug. 21, 2012) (citation omitted).  "Courts have recognized NFPA 921 as a 'guide for assessing the reliability of expert testimony in fire investigations,'" and has been deemed reliable in this Circuit.  *Cincinnati Ins. Co. v. Banks*, 610 F. App'x 453, 461 (6th Cir. 2015) (citation omitted) (affirming the inclusion of an expert's testimony that was in accordance with NFPA 921); *Thompson v. State Farm Fire & Cas. Co.*, 548 F. Supp. 2d 588, 592 (W.D. Tenn. 2008) (quoting *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 849 (N.D. Ohio 2004)); *Travelers Indem. Co. v. Ind. Paper & Packaging Corp.*, No. 3:02-cv-491, 2006 WL 1788967, at *4 (E.D. Tenn. June 27, 2006) (recognizing "that NFPA 921 is a peer reviewed and generally accepted standard in the fire investigation community."  (citations omitted)).  NFPA 921 sets forth a six-step scientific method for determining the cause of a fire:

---

[4] Bardin mischaracterizes Loud's and Olson's methodology as the use of a "differential diagnosis." (Pl.'s Mot. Exclude Loud 10; Pl.'s Mot. Exclude Olson 10); *see Willis v. Abbott Lab'ys*, No. 1:15-CV-00057-JHM, 2017 WL 5988215, at *12 (W.D. Ky. Dec. 1, 2017) ("Differential diagnosis is 'a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable on is isolated.'"  (citation omitted)); *Lee v. Marlowe*, No. 3:08 CV 1739, 2009 WL 2591668, at *3 (N.D. Ohio Aug. 20, 2009) (noting that the method of differential diagnosis is "an effective method of eliminating alternative *medical* causes of a *medical* event . . . ."  (citation omitted)).  Loud's and Olson's opinions are based on the methodologies set forth in NFPA 921.

10

"(1) identify the problem, (2) define the problem, (3) collect data, (4) analyze the data, (5) develop a hypothesis, and (6) test the hypothesis using deductive reasoning." *Travelers Cas. Ins. Co. of Am.*, 2012 WL 3610250, at *3 (citation omitted); *cf. Deductive Reasoning*, Black's Law Dictionary (11th ed. 2019) ("Reasoning that begins with a general statement or hypothesis and examines the possibilities before drawing a specific, logical conclusion.").  An expert repeats steps (3)-(6) until a hypothesis is supported.  *Id.*  Loud and Olson conducted their investigations in accordance with these standards and thus the bases for their opinions are reliable.  (*See* Loud Report 5-7, 21-38; Olson Report 12-19; *see also* Loud Report 21, 36; Loud Dep. 213:10-16).

Bardin posits that even though Loud conducted a "demonstrative test," it does not indicate that his opinion was reliable because all the test did was disprove Bardin's experts' opinions, not prove his own theory.  (Pl.'s Mot. Exclude Loud 10; Pl.'s Mot. Exclude Olson 11).  Loud does not purport to prove his own theory, but rather eliminates all possible causes of the fire aside from an accelerant on Bardin's pant leg.  (Loud Dep. 90:25-91:8; *see* Olson Report 13).  This sort of deductive reasoning is permissible under NFPA 921.  *See Ky. Farm Bureau Mut. Ins. Co. v. Hitachi Home Elecs. (Am.), Inc.*, No. 3:08-30-DCR, 2009 WL 2589854, at *3 (E.D. Ky. Aug. 20, 2009) ("Because [the expert]'s investigation followed the standards outlined in NFPA 921 § 18.2.1 for eliminating possible ignition sources, his conclusion that the television caused the fire is sufficiently reliable."); *Travelers Cas. Ins. Co. of Am.*, 2012 WL 3610250, at *3 (citation omitted) ("The inability to physically test a hypothesis does not render expert testimony inadmissible if the expert tested his or her hypothesis 'by systematically eliminating the other possible ignition sources he located in and around the area of origin in accordance with NFPA 921 § 18.2.1.'" (citation omitted)); *Ball Corp.*, 2022 WL 1801120, at *6 (finding that an expert's "use of the process of elimination is sufficiently reliable and comports with NFPA 921." (citation omitted)).

11

Any gaps in what Loud and Olson were able to prove with their investigations go to their credibility and can be explored on cross-examination.

Bardin takes further issue with the fact that Loud's test had no way of being "substantially similar" to the conditions of the fire because Loud admitted that he did not know "the inside temperature, fan speed, and humidity of Plaintiff's truck on the day of the incident." (Pl.'s Mot. Exclude Loud 10; Pl.'s Mot. Exclude Olson 11-12). Nissan argues that because the test was not intended to replicate the actual events of the incident, but rather to "document the characteristics of a fire originating at the electrical harness within the area of origin as opined by [Bardin]'s experts," that it is not required to reach the standard of substantial similarity. (Defs.' Resp. Pl.'s Mot. Exclude Loud 15; Defs.' Resp. Pl.'s Mot. Exclude Olson 15). Loud's demonstrative test does not purport to replicate the incident as it originally occurred and thus is permissible to serve as one of the bases for Loud's and Olson's opinions. Bardin will be allowed to point out any differences in Loud's test during cross-examination. *See Logan v. Cooper Tire & Rubber Co.*, No. 10-3-KSF, 2011 WL 3267894, at *3 (E.D. Ky. July 29, 2011) ("Any difference between the testing variable and the accident at issue here can be fleshed out during cross-examination, but does not justify excluding any of [the expert]'s opinions . . . .").

For these reasons, Bardin's motions to exclude testimony from Loud and Olson are denied.

### 2. *Bardin's Experts*

Nissan correspondingly contends that Jason Karasinski ("Karasinski") and Daniel Morris ("Morris") should be precluded from testifying as expert witnesses on the grounds that they are unqualified and their testimony is unreliable. (Defs.' Mot. Exclude Karasinski 2; Defs.' Mot. Exclude Morris 2).

### a.    Jason Karasinski

Karasinski's opinion in this action is that the fire in the truck was the result of "some sort of a failure in the electrical energy in the dashboard."  (Karasinski Dep. 93:1-10, Dec. 21, 2022, DN 67-8).  In his deposition, Karasinski admitted that he was unable to point to any specific manufacturing defect which would have caused the fire.  (Karasinski Dep. 97:19-98:3).  Karasinski explained, however, that he determined that the fire's area of origin was between the gas pedal and the dashboard.  (Karasinski Dep. 93:1-10).  Karasinski further explained that based on the potential ignition sources and connections that are located in the dash, a high resistance connection could be the only source of sufficient heat to ignite the wiring harness, plastic, or foam in the dashboard.  (Karasinski Dep. 104:8-18).  Karasinski conceded that any potential physical evidence had either melted in the fire or could also be explained as a result of the fire rather than a cause.  (Karasinski Dep. 93:18-97:3).

Karasinski opined that his theory was consistent with Bardin's description of the fire as erupting suddenly and without any preceding smell.  (Karasinski Dep. 110:21-113:13).  He explained that electrical fires he reviews can occur quickly and that, while it was unusual that Bardin did not smell anything beforehand, the heating system in the car may have been pushing the smell into the back of the truck's interior.  (Karasinski Dep. 113:11-114:15).  Karasinski also concluded that static electricity igniting Bardin's pant leg could be excluded as a potential cause of the fire.  (Karasinski Demonstration Summ. 10-11, Nov. 30, 2022, DN 69-12 [hereinafter Karasinski Rebuttal]).  Karasinski based this opinion on NFPA guidelines, weather data, his knowledge of the case, and a demonstration he conducted to test the flammability of WD-40. (Karasinski Rebuttal 11).

Karasinski graduated from Lambuth University with a degree in business management and a minor in marketing. (Karasinski Dep. 36:4-7, 49:3-11). He began his career in insurance and then began working for Liberty Mutual Insurance Company where he received fire investigation training in 2003. (Karasinski Dep. 36:8-23, 37:18-20). From 2003 until 2008, Karasinski was involved with fire investigation—albeit not his primary role—but he was then promoted and formed a fire investigation unit at Liberty Mutual in 2008. (Karasinski Dep. 37:4-5, 38:4-6). In January 2014, Karasinski left Liberty Mutual to start his own business, Fire Research and Technology. (Karasinski Dep. 38:7-10). Karasinski has numerous certifications in the field of fire investigation and is a member of several professional associations of fire and arson investigators. (Karasinski CV; Defs.' Mot. Exclude Karasinski Ex. 10, at 1-2, DN 69-10).

Nissan argues that Karasinski is unqualified to opine that the fire was a result of some unknown electrical malfunction because he has never worked in the motor vehicle industry and has no experience or education as an electrical engineer. (Defs.' Mot. Exclude Karasinski 19). Nissan also argues that Karasinski is unqualified to opine about how weather differs across varying distances or how weather data from Lexington, Kentucky, could be indicative of weather conditions in Columbia, Kentucky. (Defs.' Mot. Exclude Karasinski 19-20). The Court finds both arguments unpersuasive.

Karasinski has significant experience in the field of fire investigation, and all the opinions that he offers, even to the extent they touch on the subjects of electrical engineering or the inner workings of an automobile, relate to the origin of the fire in the truck. When considering the qualifications of experts under Rule 702, "[t]he issue . . . is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Rose v. Truck Ctr., Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010) (quoting *Berry*

*v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  Here, Karasinski opines that an electrical malfunction was the only ignition source which could supply sufficient heat to cause the sort of fire that occurred.  (Karasinski Dep. 104:8-18).  Karasinski's opinion is based on deduction, and he explained his basis for excluding other potential sources of the fire.  (Karasinski Dep. 98:13-102:11).  Karasinski does not need to be an expert in electrical engineering or motor vehicle manufacturing to express opinions how electrical components within the car could create a fire; Karasinski's experience as a fire investigator, including investigations of vehicle fires, qualifies him to offer this testimony.  Nissan may raise any perceived deficiency in Karasinski's qualifications on cross-examination.

Nissan argues next that Karasinski is not an expert in meteorology and cannot "testify regarding how the weather differs across varying distances, or the weather in general."  (Defs.' Mot. Exclude Karasinski 19-20).  Nissan also points out that Karasinski offers no support for the notion that a weather report from Lexington, Kentucky would be predictive of the weather in Columbia, Kentucky at the time of the fire.  (Defs.' Mot. Exclude Karasinski 19-20).  In his deposition, Karasinski did not offer any testimony about how weather differs across varying distances.  When asked about the relative humidity in Columbia, Kentucky at the time of the fire, Karasinski replied "[a]ll I can say is . . . between the time of the incident, which I would say 2 until 4, [the humidity] was between 64 and 70 percent in Lexington."  (Karasinski Dep. 126:3-8).  Karasinski does not need any special experience or training to read a weather report.  Nissan's criticisms of Karasinski's reliance on this report may be raised on cross-examination.

Nissan also states that Karasinski's opinion is unreliable, asserting that his opinions are *ipse dixit* conclusions that contradict Bardin's testimony and are unsupported by any physical evidence or testing.  (Defs.' Mot. Exclude Karasinski 20-26).  Nissan points specifically to

Karasinski's admission that he did not find any physical evidence of the alleged electrical malfunction and that he did not conduct any testing to verify his hypothesis. (Defs.' Mot. Exclude Karasinski 23). Karasinski testified that he relied on the scientific method as set forth in NFPA 921 (just like Nissan's experts). (Karasinski Dep. 156:7-19). Bardin responds that Karasinski adhered to NFPA 921 when he used the process of elimination to determine that an electrical malfunction was the only probable source of the fire. (Pl.'s Resp. Defs.' Mot. Exclude Karasinski 10-11, DN-78 [hereinafter Pl.'s Resp. Karasinski]).

Experts for both parties testified that they used the methodology outlined in NFPA 921 in drawing their conclusions about this case. (Loud Dep. 127:19-21; Olson Dep. 87:23-88:1; Morris 73:17-74:4). As explained in the prior section, NFPA is a recognized guide for assessing the reliability of expert testimony in fire investigations. *See, e.g., Thompson*, 548 F. Supp. 2d at 592 (quoting *Ind. Ins. Co.*, 326 F. Supp. 2d at 849). Courts have further recognized that "[the] analysis of supplementing burn pattern observation by eliminating other explanations for a burn pattern, eliminating other ignition sources, and using other positive evidence to conclude a cause of a fire comports with NFPA 921 guidelines." *Alford v. Allstate Ins. Co.*, No. 12-cv-14238, 2013 WL 12181846, at *4 (E.D. Mich. July 8, 2013) (citation omitted); *see also Hudson v. State Farm Fire & Cas. Co.*, No. 4:14-CV-0123-HLM, 2015 WL 12434321, at *6 (N.D. Ga. June 24, 2015) (allowing an expert fire investigator who, following NFPA 921, did not identify a specific ignition source but tested and ruled out other hypotheses and identified affirmative evidence supporting his hypothesis). Thus, Karasinski's method for reaching his conclusion was reliable.

Nissan contends that although Karasinski purports to have followed NFPA 921 in reaching his conclusions, his opinion is in reality one borne from confirmation bias and not careful analytical reasoning, lodging several criticisms of the basis for his opinion. (Defs.' Mot. Exclude Karasinski

22).  First, Nissan points to the fact that Plaintiff, the sole witness to the fire, testified that the fire erupted suddenly and without any preceding smoke or smell.  (Defs.' Mot. Exclude Karasinski 21; Bardin Dep. 102:2-104:14, DN 69-6).  In his deposition, however, Karasinski addressed Bardin's testimony and opined that it was consistent with an electrical fire.  (Karasinski Dep. 113:11-114:15).  Nissan also points out that Karasinski did not even consider the can of WD-40 in the car during his initial report.  (Defs.' Mot. Exclude Karasinski 21).  While the WD-40 was not mentioned in Karasinski initial report, he addressed this theory in his supplemental report, having tested its flammability by trying to ignite a stream of WD-40 and then a patch of denim submerged in a pie-tin full of WD-40.  (Karasinski Rebuttal).

Nissan then argues that Karasinski's WD-40 demonstration is inapplicable here, suggesting Karasinski's experiment was not sufficiently similar to the condition of Bardin's pants at the time of the fire.  (Defs.' Mot. Exclude Karasinski 24).  These criticisms may be addressed during cross-examination, where Nissan will be able to question perceived faults in Karasinski's experiment and their effects on his conclusion that the fire was not caused by an accelerant and static electricity.

The reliability inquiry focuses "solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.  Karasinski formed his opinion after:  (1) analyzing the location of the fire; (2) analyzing the damage caused by the fire; and (3) ruling out other possible causes.  (Karasinski Dep. 93:1-10, 98:13-102:11, 104:8-18; Karasinski Rebuttal).  This methodology comports with NFPA 921.  *Alford*, 2013 WL 12181846, at *4.  Therefore, Karasinski's testimony is reliable.  Nissan may raise any criticisms it has of Karasinski's reasoning or the bases for his opinions during cross-examination.

In conclusion, Karasinski is qualified to render his opinions, and his opinions are based on reliable principles and methodology and will assist the jury in weighing the evidence.  Nissan's motion to exclude testimony from Karasinski is therefore denied.

### b.   Daniel Morris

In his report, Morris opined:

> The most probable ignition sequence, and the only ignition sequence [Morris] cannot rule out based on his investigation, is a high resistance connection or an electrical short of the wiring, connectors or components in the dash on the left side of the subject vehicle just above the accelerator pedal.  The heating as a result of the aforementioned condition most probably ignited the combustible resins which spread to the dash, causing the flammable resins of the dash to drip on the leg of [Bardin].

(Defs.' Mot. Exclude Morris Ex. 2, at 30, DN 70-2 [hereinafter Morris Report]).  Morris admitted that there was no physical evidence to support his theory of the fire because any physical evidence of the fire was a result of the fire or was destroyed in the fire.  (Morris Dep. 115:6-118:12).  Morris also admitted that he did not do any testing to support his hypothesis but explained that he formed his opinion by ruling out any other possible ignition source.  (Morris Dep. 118:13-121:2, 137:15-137:19).

Like with Karasinski, Nissan argues that Morris is unqualified to opine on the electrical mechanism he alleges caused the fire.  (Defs.' Mot. Exclude Morris 17).  Nissan also claims that Morris is unqualified to express an opinion about how weather differs across varying distances or how weather data from Lexington, Kentucky could be indicative of weather conditions in Columbia, Kentucky.  (Defs.' Mot. Exclude Karasinski 17).

Morris received a Bachelor of Science degree in agricultural systems management from Purdue University.  (Defs.' Mot. Exclude Morris Ex. 5, at 5, DN 70-5 [hereinafter Morris CV]).  Morris began employment in the automotive industry at Honda as an electrical systems

engineering team manager, hybrid battery unit team leader, and electrical systems engineer. (Morris CV 4-5).  Morris received hands-on training in thermal investigation and investigated "four or five" thermal events while working for Honda.  (Morris Dep. 40:10-40:23, 65:8-65:19). Morris was involved in the redesign of a wire harness at Honda for a vehicle that had a smoking fire issue in its door.  (Morris Dep. 69:13-70:2).  In 2019, Morris began working for Fire Research & Technology, LLC "on the side" and joined the company full time in 2021.  (Morris CV 4; Morris Dep. 61:19-62:10).  In 2020, he began formal fire investigation training and became certified as a fire and explosion investigator.  (Morris CV 2-3; Morris Dep. 54:19-55:3, 65:16-23).  Morris testified that he has investigated seventy-five vehicle fires while working for Fire Research & Technology, LLC.  (Morris Dep. 52:21-53:5).

As explained above, when considering the qualifications of experts under Rule 702, "[t]he issue . . . is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Rose*, 388 F. App'x at 533 (quoting *Berry*, 25 F.3d at 1351).  Morris' nine years in the automobile design and manufacturing industry, his experience working on the electrical systems of vehicles, and his work and training in the field of fire investigation render him qualified to opine regarding the probable cause of the fire in this case.

With respect to Morris' opinions about the weather, Morris testified that he used weather data from Lexington because Lexington was the weather station closest to the accident site. (Morris Dep. 126:23-127:5).  Morris also indicated that he "could probably derive [the humidity in Columbia] based on temperature . . . ."  (Morris Dep. 127:9-13).  As with Karasinski, Nissan's criticisms of Morris' reliance on this data may be raised on cross-examination.  Morris is permitted to testify as to his reasoning for relying on the weather report from Lexington and as to what

weather data fire investigators use when conducting an investigation.  There has been no showing, however, that Morris is qualified to testify as to the similarity of weather data in Lexington and Columbia or about methods for calculating the humidity in Columbia based on the reported weather in Lexington; Morris is therefore not permitted to testify as to these subjects.

Nissan next argues that Morris' opinion is unreliable.  Nissan asserts that Morris' opinions are *ipse dixit* conclusions that contradict Bardin's testimony and are unsupported by any physical evidence or testing.  (Defs.' Mot. Exclude Morris 17-18).  Nissan's criticisms of the reliability of Morris' opinion mirror its criticisms of Karasinski's opinion, which are discounted above.  Nissan argues that Morris reached his conclusion despite a lack of physical evidence, lack of testing, and inconsistencies between Morris' theory and Bardin's testimony.  (Defs.' Mot. Exclude Morris 18).

Morris employed NFPA 921 in conducting his analysis and determined that an electrical malfunction was the only probable cause of the fire.  (Morris Report 2-4).  Morris relied on Karasinski's demonstration, weather data from Lexington, as well as Bardin's testimony, in ruling out Nissan's accelerant theory.  (Morris Dep. 151:13-154:16).  Morris formed his opinion after: (1) analyzing the fire pattern; (2) reviewing the vehicle's electrical system; (3) reading Bardin's testimony; and (4) ruling out other possible causes.  (Morris Report 8-29, 31; Morris Dep. 102:9-105:1, 119:8-121:2).  Morris testified that another employee of Fire Research & Technology reviewed his opinion to ensure the report adhered to NFPA 921.  (Morris Dep. 73:12-74:4).  Like Karasinski, Morris employed reliable principles and methodology in conducting his investigation, and therefore his testimony is reliable.

In conclusion, Morris is qualified to render his opinions, and his opinions are based on reliable principles and methodology and will assist the jury in weighing the evidence.  Nissan's motion to exclude Morris as a witness is therefore denied.

**B.**   **Motion for Summary Judgment**

**1.**   **Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thereafter, the burden shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the case, beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The nonmoving party must present facts demonstrating a material factual dispute that must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial"; the evidence, however, is "not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). When considering the evidence, the Court must view it in the light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). If the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, the motion should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The parties do not question that Kentucky law applies in this action. *See Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006) ("As we are sitting in diversity, we apply the substantive law of Kentucky, the forum state." (citation omitted)). "The [Kentucky Product Liability Act] applies to all damage claims arising from the use of products, regardless of the legal theory advanced." *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997); *see* KRS 411.300(1); *see also Thacker v. Ethicon, Inc.*, 47 F.4th 451, 459 (6th Cir. 2022). A plaintiff may advance a product liability action against a manufacturer under theories of strict liability, negligence, and

breach of warranty.  *Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 705 (W.D. Ky. 2013) (citing

*Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985)).   The Kentucky Product Liability Act

recognizes claims based on defective design, defective manufacture, and failure to warn.  *Id.* (citing

*Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995)); *cf. Red Hed Oil, Inc. v. H.T. Hackney*

*Co.*, 292 F. Supp. 3d 764, 772 (E.D. Ky. 2017) (citing *CertainTeed Corp. v. Dexter*, 330 S.W.3d

64, 79 (Ky. 2010)) (noting that each theory constitutes separate and distinct claims).   In such

actions, the plaintiff must show that the product had a defect and that the defect caused the alleged

damages.  *Prather*, 960 F. Supp. 2d at 706 (citing *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d

838, 839 (E.D. Ky. 1998); *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995)).

## 2.     Analysis

Nissan moves for summary judgment on all of Bardin's claims against it.  (Defs.' Mot.

Summ. J. 1).   Bardin has abandoned his claims of design defect and inadequate warnings (Pl.'s

Resp. Defs.' Mot. Summ. J. 9 n.3, DN 79 [hereinafter Pl.'s Resp. Summ. J.]); therefore, Nissan's

motion will be granted as to those claims.

### a.     Manufacturing Defect

The parties focus their briefing on whether there is a genuine issue of material fact that a

manufacturing defect caused the subject fire.  (Defs.' Mot. Summ. J. 20-24; Pl.'s Resp. Summ. J.

14-18; Defs.' Reply Mot. Summ. J. 8-11, DN 82 [hereinafter Defs.' Reply Summ. J.]).[5]   "A

manufacturing-defect claim contends that a product is 'unreasonably dangerous' because of 'an

error in the process of manufacture or assembly.'"   *Garvin v. Ethicon, Inc.*, 616 F. Supp. 3d 658,

---

[5] The Complaint contains two counts asserting claims for a manufacturing defect against both
Nissan Defendants; Count I is based on strict liability and Count II is based on negligence.  (Compl.
¶¶ 27-40, 51-64).   In their briefing, the parties do not distinguish between the negligence and strict
liability claims.   Because Bardin's negligence and strict liability claims are premised on the same
allegations, it is unnecessary to address them separately.

667 (W.D. Ky. 2022) (quoting *Ford Motor Co. v. McCamish*, 559 S.W.2d 507, 509 (Ky. App. 1977)).  "To prevail on this claim, a plaintiff must show that 'a defective condition attributable to [the manufacturer], existing at the time of delivery . . . was a proximate cause' of the plaintiff's injuries.  *Id.* (alterations in original) (quoting *Briner v. Gen. Motors Corp.*, 461 S.W.2d 99, 103 (Ky. 1970)).  A manufacturing defect claim requires the jury to determine whether the product failed because of an error in the process of manufacture or assembly.  *Schall v. Suzuki Motor of Am., Inc.*, 450 F. Supp. 3d 771, 779 (W.D. Ky. 2020) (citing *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005); *Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 743-44 (W.D. Ky. 2014)).

"In products liability cases, the plaintiff must demonstrate that an identifiable defect probably caused the accident."  *Gray v. Gen. Motors Corp.*, 133 F. Supp. 2d 530, 533 (E.D. Ky. 2001) (citing *Midwestern V.W. Corp. v. Ringley*, 503 S.W.2d 745 (Ky. 1973)).  In some circumstances, however, "Kentucky law allows a plaintiff to establish a product defect that probably caused his injuries with circumstantial evidence."  *Halsey v. AGCO Corp.*, 755 F. App'x 524, 532 (6th Cir. 2018) (citing *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 379 (6th Cir. 2014)); *Ky. Farm Bureau Mut. Ins. Co. v. Gen. Elec. Co.*, No. 3:09-CV-00915-JHM, 2011 WL 195615, at *2 (W.D. Ky. Jan. 20, 2011) ("Generally, the existence of a defect in the product itself may be established by a sufficient quantum of circumstantial evidence."  (quoting *Holbrook*, 458 S.W.2d at 158)).  "Circumstantial evidence may demonstrate the defect if the evidence is 'sufficient to tilt the balance from possibility to probability.'"  *Ky. Farm Bureau*, 2011 WL 195615, at *2 (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 507 (6th Cir. 1998)).  The Sixth Circuit explained:

> Where an incident could result from more than one cause, plaintiff tips the balance
> from possibility to probability only by ruling out other theories of causation:

> [W]here an injury may as reasonably be attributed to a cause that will excuse the defendant as to a cause that will subject it to liability, recovery can be had.

*In re Beverly Hills Fire Litig.*, 695 F.2d 207, 219 (6th Cir. 1982) (alteration in original) (quoting *Sutton's Adm'r. v. Louisville & N.R. Co.*, 181 S.W. 938, 940 (Ky. 1916)).

Bardin's experts conceded that they were unable to identify a specific manufacturing defect and that there is no physical evidence of an electrical malfunction. (Karasinski Dep. 97:19-98:3, 109:6-10; Morris Dep. 122:19-123:2). Plaintiffs' experts agree, however, that the only probable cause of the fire that cannot be eliminated is an electrical failure. (Karasinski Report 19; Morris Report 34). Therefore, the Court must determine, viewing the evidence in the light most favorable to Bardin, if there is any genuine issue of material fact that Bardin has "tip[ped] the balance from possibility to probability."[6]

Nissan asserts three main arguments that Bardin's evidence fails to establish a manufacturing defect: (1) Bardin cannot rely on circumstantial evidence because his own expert, Morris, admitted that he could have done more testing to confirm his theory; (2) Bardin's theory of the fire is inconsistent with his own eye-witness testimony; and (3) Bardin's basis for ruling out an accelerant as a possible cause of the fire is flawed. (Defs.' Mot. Summ. J. 23 n.11, 26-28). Nissan submits that Bardin cannot rely on circumstantial evidence because his expert, Morris, admitted that he could have done additional testing to potentially discover a manufacturing defect. (Defs.' Reply Summ. J. 5-6).

---

[6] Nissan's first argument is that Bardin has no competent expert proof to support his claim, relying on its motions to exclude Bardin's expert witnesses. (Defs.' Mot. Summ. J. 20-22). As the Court has denied these motions, Bardin has supporting expert proof.

Nissan relies on *Gray v. General Motor Corp.*, where a sister court held that the plaintiff's proof was insufficient to tip the balance from possibility to probability because the plaintiff identified a number of potential ways that a seatbelt might have malfunctioned but failed to sufficiently identify a defect. *Gray*, 133 F. Supp. 2d at 533-34. The parties agree that *Gray* was distinguished by this Court in *Kentucky Farm Bureau Mutual Insurance Company v. General Electric Company*, a products liability action involving an allegedly defective dryer. *Ky. Farm Bureau*, 2011 WL 195615, at *1. In *Kentucky Farm Bureau*, the defendant, moving for summary judgment and relying on *Gray*, argued that the plaintiff needed to do more than point out potential problems within the dryer to prove its case with circumstantial evidence. *Id.* at *3. This Court denied summary judgment, distinguishing *Gray* and holding that the dryer, unlike the allegedly defective product in *Gray*, was so damaged that the experts were unable to conclusively determine what caused the fire. *Id.* The Court also relied on the plaintiff's expert testimony that "to conduct further testing would destroy what was left of the inner workings of the dryer." *Id.*

Nissan's contention is based on Morris' testimony regarding the significance of the 11-12 blown fuses he found in the Nissan, explaining the blown fuses evidenced short circuits in the vehicle. (Defs.' Reply Summ. J. 5-6; Morris Dep. 98:2-99:10). Morris conceded that a "complete destructive exam" "may" identify the short circuits and the cause of the fire. (Morris Dep. 99:2-8).

Morris' response that complete destructive testing *may* have allowed him to determine the origin of the fire is not sufficiently definite to preclude Bardin from introducing circumstantial evidence that an electrical malfunction was the cause of the fire. Bardin's experts repeatedly testified that they were unable to find physical evidence of a defect because such evidence had been destroyed in the fire. (Karasinski Dep. 97:19-98:3, 109:6-10; Morris Dep. 122:19-123:2).

25

Like in *Kentucky Farm Bureau*, where the plaintiff's expert testified that additional testing would have destroyed the dryer, Morris stated that he would need to conduct a "complete destructive exam," which "may" reveal the source of the fire. *Ky. Farm Bureau*, 2011 WL 195615, at *3; (Morris Dep. 99:2-8). The circumstances of this close align more closely to *Kentucky Farm Bureau* than to *Grey*, and therefore Bardin may rely on circumstantial evidence.

Next, Nissan posits that Bardin's theory contradicts his own eye-witness account of the fire. (Defs.' Mot. Summ. J. 26-27). Bardin testified that the fire happened suddenly and without any preceding smell. (Bardin Dep. 103:5-104:14). Nissan points to the testing its experts conducted to simulate the effects of an electrical fire. (Defs.' Mot. Summ. J. 26-27). In the test, a propane flame was used to ignite the wiring harness of a 2013 Nissan Frontier to create the effect of an electrical fire. (Olson Report 17). Olson sat in the vehicle and attached a thermocouple to his right pants leg. (Loud Report 24-25). He had to exit the vehicle due to a buildup of acrid smoke before the thermocouple detected any change in temperature. (Loud Report 30). Nissan argues that "[t]he results of this demonstration testing show that Plaintiff's causation theory is impossible" in light of Bardin's account of the fire. (Defs.' Mot. Summ. J. 9). Both of Bardin's experts, however, testified that it would be possible for an electrical fire to erupt quickly and without much smell, depending on the material being burned. (Morris Dep. 112: 1-113:17; Karasinski Dep. 111:7-113:13). Morris also testified that the manner in which Nissan's experts conducted the test, igniting the fire from the outside, could have produced a different amount of smoke than an ignition occurring from an electrical malfunction on the inside. (Morris Dep. 137:11-138:13). Viewing the evidence in the light most favorable to Bardin, Nissan's demonstration, considered alongside the testimony of Bardin's expert, does not disprove Bardin's theory but instead presents an issue for the trier of fact.

Finally, Nissan contends that Karasinski's WD-40 testing is inapplicable to this case. (Defs.' Mot. Summ. J. 27-28).   As discussed above considering Nissan's motions to exclude, Nissan may address Morris' and Karasinski's reliance on the WD-40 testing at cross-examination. Further, the WD-40 testing was not Morris' and Karasinski's sole basis for eliminating Nissan's accelerant theory.   Morris testified that he excluded Nissan's theory due to the humidity levels as well as Bardin's testimony that (1) he was not aware of any flammable substances in the vehicle, (2) he did not smell any flammable liquids, and (3) he had not spilled anything on his pants. (Morris Dep. 153:23-154:13; Bardin Dep. 112:1-18).   Karasinski testified that in addition to his demonstration, he excluded Nissan's theory due to the humidity at the time of the fire.   (Karasinski Rebuttal 10).[7]

Each party has presented a theory based on the assertion that it is the only probable cause of the fire that cannot be ruled out.   The opposing party's experts criticize and dismiss the others' theories.   Viewing the evidence in the light most favorable to Bardin, he has created a genuine issue of material fact as to whether his evidence tips his electrical malfunction theory from possibility to probability.   Therefore, Nissan's Motion for Summary Judgment must be denied as to Bardin's strict liability and negligence manufacturing defect claims.

### b.   Breach of Warranty

Nissan moves for summary judgment on Bardin's breach of warranty claims, arguing that Bardin was not in privity with Nissan.   Under Kentucky Law, privity is a prerequisite for products liability claims based on breach of a warranty.   *Compex Int'l. Co. v. Taylor*, 209 S.W.3d 462, 464

---

[7] Nissan excepts to Morris' and Karasinski's reliance on weather data from Lexington; however, Nissan's expert, Loud, relied on this same data in his report.   (Loud Report 11).   As explained above when ruling on Nissan's motions to exclude, the experts' reliance on this data goes to their credibility and not to admissibility of their opinions.

(Ky. 2006).  KRS 355.2-318 creates an exception to the privity requirement.  *Id.* at 464-65.  KRS 355.2-318 states:

> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.  A seller may not exclude or limit the operation of this section.

KRS 355.2-318.  This exception is limited and includes only those individuals who enjoy the specified relationship with the buyer.  *Compex Int'l Co.*, 209 S.W.3d at 465.

It is undisputed that Herbert Turner ("Turner"), and not Bardin, purchased the Truck and that Bardin is not in privity with Nissan.  (Defs.' Mot. Summ. J. 31; Pl.'s Resp. Summ. J. 18).  Bardin argues, however, that he fits within the exception created by KRS 355.2-318.  Nissan relies on Turner's testimony that he had only allowed Bardin to stay in a garage apartment on his property because Turner thought he was homeless, and that Turner ultimately had to evict Bardin to remove him from the property.  (Defs.' Mot. Summ. J. 31; Turner Dep. 40:11-41:9).  Turner also testified that he had asked Bardin to leave several times before evicting him.  (Turner Dep. 41:25-42:6).  Finally, Turner testified that he did not give Bardin permission to use the truck on the day of the fire.  (Turner Dep. 45:3-46:3).

Bardin paints a very different picture of his relationship with Turner.  Bardin testified that Turner gave him permission to live in the garage apartment for the rest of Turner's life without paying rent and that he would help Turner out, but that he did not do so pursuant to any agreement.  (Bardin Dep. 18:2-18).  Bardin also testified that he had driven the truck more than ten times before the fire and that Turner had allowed him to drive the truck alone once before.  (Bardin Dep. 19:16-21, 78:5-23).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. Bardin's and Turner's characterizations of their relationship are irreconcilable. The Court would be required to weigh this conflicting evidence and make a determination as to the witnesses' credibility in order to resolve this claim. Based on Bardin's testimony, a reasonable jury could determine that Bardin was a guest in Turner's home and that it was reasonable to expect him to use the truck. Accordingly, there is a genuine issue of material fact as to whether Bardin falls into the exception created by KRS 355.2-318, and Nissan is not entitled to judgment as a matter of law as to this claim.

### c.      Punitive Damages

Nissan argues that it is entitled to summary judgment on Bardin's claim for punitive damages because Bardin has failed to present any evidence, much less clear and convincing evidence that Nissan acted towards Bardin with oppression, fraud, malice, or gross negligence. (Defs.' Mot. Summ. J. 31-33).

Under Kentucky law, a plaintiff may recover punitive damages only upon proving, by clear and convincing evidence, that the defendant acted toward the plaintiff with oppression, fraud, malice, or gross negligence. KRS 411.184(2) ("A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice."); *Turner v. Werner Enters., Inc.*, 442 F. Supp. 2d 384, 385 (E.D. Ky. 2006) ("[T]he Kentucky Supreme Court has determined that notwithstanding [] [KRS 411.184], punitive damages are still available if gross negligence is shown." (citing *Williams v. Wilson*, 972 S.W.2d 260, 262-65 (Ky. 1998))). "In order to justify

punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Nissan Motor Co. v. Maddox*, 486 S.W.3d 838, 840 (Ky. 2015) (citation omitted). "[W]here the nonmoving party faces a heightened burden of proof, such as clear and convincing evidence, he must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard." *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 944 (6th Cir. 1990) (citation omitted).

Nissan states that there is no evidence that it acted toward Bardin with the requisite wanton or reckless disregard for the lives, safety, or property of others. (Defs.' Mot. Summ. J. 33). Bardin relies on Morris' testimony that based on the truck's Single Unit History, the truck had sixteen total manufacturing defects when it was assembled, but that only eight of them were repaired to show that Nissan "[was] on notice that the subject vehicle had defects before [it] recklessly allowed the vehicle to leave the factory and enter the stream of commerce." (Pl.'s Resp. Summ. J. 21; Morris Dep. 106:20-107:14). Nissan replies that Morris misinterpreted the document upon which he bases that opinion, and points to the declaration of Bridget Leschhorn ("Leschhorn"), a senior manufacturing engineer at Nissan, who states that only the Single Unit History only shows eight defects and that all eight defects were repaired. (Defs.' Reply Summ. J. 12; Leschhorn Decl. ¶ 6, DN 82-10).

Reviewing the Single Unit History underlying Morris' and Leschhorn's opinions, it is clear that only eight defects were discovered during the vehicle's assembly. (Leschhorn Decl. Ex. 1, DN 82-10 [hereinafter Single Unit History]). On the Single Unit History, a chart labelled "Inspections" shows the start and end times of the inspection, the duration, the shift during which the inspection occurred, the station, the user, and the number of defects. (Single Unit History 1-

30

2).  The two rightmost columns of the "Inspections" chart are both labeled "# Defects."  (Single Unit History 1-2).  The first "# Defects" column has five total entries, and the second "# Defects" column has a total of seven entries; all of the entries in the "# Defects" columns consist of a single integer.  (Single Unit History 1-2).  The total sum of the integers in each column is eight.  (Single Unit History at 1-2).  Below the "Inspections" chart, there are eight charts under a heading titled "Defects."  (Single Unit History  2-3).  These charts consist of three sections, one in grey, one in yellow, and one in green.  (Single Unit History 2-3).  The time, station, and, in all but one case, the user, listed in the grey portions of the charts correspond to the entries in the first "# Defects" column in the inspections chart.  (Single Unit History 1-3).  The time, station, and user listed in the yellow portions of the charts correspond to the entries in the second "# Defects" column. (Single Unit History 1-3).  Morris apparently reached his conclusion by adding together the values of both "# defects" columns, totaling sixteen, and then counting the number of repairs shown in the "Defects" section, totaling eight, without acknowledging that all sixteen of the entries related to the "# defects" columns are incorporated into the eight repairs.  The Court need not weigh the evidence to determine that Morris' calculation that the truck had sixteen defects during assembly is not supported by the Single Unit History and should therefore be excluded.  *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert testimony . . . is inadmissible when the facts upon which the expert bases his testimony contradict the evidence."  (citation omitted)).  Therefore, Bardin's argument that Nissan had knowledge of the alleged defect based on Morris' testimony is insufficient to create a genuine issue of material fact.

Based upon the evidence presented, no reasonable jury could find, by clear and convincing evidence, that Nissan acted towards Bardin with oppression, fraud, malice, or gross negligence.  Accordingly, Nissan is entitled to summary judgment on Bardin's claim for punitive damages.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.      Plaintiff's Motions to Exclude (DNs 64, 65) and Defendants' Motion to Exclude (DNs 69, 70) are **DENIED**.

2.      Defendants' Motion for Summary Judgment (DN 67) is **GRANTED IN PART** and **DENIED IN PART**.

3.      Defendants' Motions for Leave to Exceed Page Limit (DNs 66, 68) are **GRANTED.**

Greg N. Stivers, Chief Judge
United States District Court

September 28, 2023

cc:     counsel of record